

# NIXON PEABODY LLP
ATTORNEYS AT LAW

100 Summer Street
Boston, Massachusetts 02110-2131
(617) 345-1000
FAX: (617) 345-1300

Deborah L. Thaxter P.C.
Direct Dial: (617) 345-1326
E-Mail Address: dthaxter@nixonpeabody.com

February 20, 2007

<u>Via Fax and Regular Mail</u>

Stephen R. Calkins, Esq.  
Senior Managing Counsel  
Office Depot, Inc.  
2200 Old Germantown Road  
Delray Beach, FL 33445  
Fax: 561-438-5231

Daniel F. Katz, Esq.  
Williams & Connolly LLP  
725 12th Street, NW  
Washington, DC 20005  
Fax: 202-434-5029

RE:   <u>W.B. Mason Company, Inc.</u>

Gentlemen:

This letter is sent on behalf of my client, W.B. Mason Company, Inc. ("WB Mason"), and constitutes a "WB Mason Notice of Hire" within the meaning, and pursuant to, the Settlement Agreement dated February 8, 2007 by and between WB Mason, Office Depot, Inc. and AOS Acquisition LLC.

Please take notice that WB Mason has hired Roger Post.

I have attached to this letter Mr. Post's Amended and Restated Employment Agreement dated August 15, 2003 containing, among other things, post-employment restrictive covenants.

Very truly yours,

*Deborah Thaxter*

Deborah L. Thaxter, P.C.

Enclosure  
cc:   Mark Rogart, Esq.

THIS AMENDED AND RESTATED EMPLOYMENT AGREEMENT (the "Agreement") is made as of August 15, 2003 (the "Effective Date"), by and between AOS ACQUISITION CORP., a Delaware corporation, anticipated to do business as ALLIED OFFICE SUPPLIES ("Supplies"), having its principal office at 100 Delawanna Avenue, Clifton, New Jersey 07014 (hereinafter referred to as the "Company"), and ROGER POST, an individual residing at 22 Millard Drive, Hackettstown, New Jersey 07840 (hereinafter referred to as the "Executive").

## WITNESSETH:

**WHEREAS**, Supplies and the Executive are parties to an Employment Letter dated as of June 13, 2003 (the "Existing Employment Agreement"); and

**WHEREAS**, the Company intends to acquire the assets of Supplies and, accordingly, the Company and the Executive desire to amend and restate in its entirety the Existing Employment Agreement by entering into this Agreement; and

**WHEREAS**, the Executive wishes to continue such employment with the Company upon the terms and conditions set forth in the Agreement

**NOW, THEREFORE**, in consideration of the above, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1. **Employment.**

The Company hereby agrees to employ the Executive and the Executive hereby accepts employment by the Company upon the terms and conditions hereinafter set forth.

Section 2. **Employment Period.**

(a) Subject to the provisions of Section 8 hereof, the term of the Executive's employment by the Company under this Agreement shall commence upon the Closing as defined in Section 2(c) below (the "Effective Date") and shall continue until July 31, 2008. The term of the Executive's Employment hereunder is hereinafter referred to as the "Employment Period".

(b) At least ninety (90) days prior to the expiration of the then current Employment Period, the Company shall deliver to the Executive a notice either (i) offering the Executive an extension of the then current Employment Period (an "Extension Offer") or (ii) stating its desire not to extend the then current Employment Period (a "Company Expiration Notice"); provided, that each Extension Offer shall be for a period of no less than one calendar year. Executive shall accept each Extension Offer (an "Acceptance Notice") or decline each Extension Offer (an "Executive Expiration Notice") by written notice to the Company within 15 calendar days of his receipt of the same.

(c) This Agreement is being executed in anticipation of the Company's acquisition of the assets of Supplies and the assumption by the Company of Supplies' obligations. It is agreed that the "Effective Date" of this Agreement will be the day of the closing (the "Closing") of the transaction whereby the Company takes control of Supplies' assets. Further,

10713 v1

upon consummation of the Closing, Executive agrees that the Existing Employment Agreement will be cancelled without the necessity of a further writing and shall be of no further effect and Executive will have no further rights or claims under the Existing Employment Agreement.

**Section 3. Compensation; Bonus.**

(a) From the Effective Date and continuing through July 31, 2008, the Company shall pay to the Executive for all services rendered under this Agreement a base salary at an annual rate of $200,000.00, subject to increases at the discretion of the President, or Chairman, or Board of Directors (the "Salary"), payable in accordance with the Company's customary payroll practices.

(b) Subject to the terms of this Section 3, the Executive shall be eligible to receive a bonus as set forth on Schedule A hereto (the "Bonus") for each of Fiscal Years 2004, 2005, 2006 and 2007 based upon the Company achieving the percentages of Projected EBITDA set forth on Schedule A hereto with respect to such Fiscal year. The Executive may also be considered for an additional discretionary bonus as approved by the Board of Directors. If Executive is employed through December 31, 2007 he will receive the Fiscal Year 2007 bonus, even if his employment is not renewed by Allied (unless the non-renewal is for Cause).

(c) Subject to Section 9, the Bonus, if any, shall be paid no later than March 15 of the year immediately following the Fiscal Year for which such Bonus, if any, was earned, but only after the approval by the Board of Directors of the audited financial statements with respect to such fiscal Year from which such EBITDA shall be derived. Subject to the limited exception provided in Section 3(b) above, to receive the Bonus the Executive must be actively employed by the Company as of February 1 of the year immediately following the Fiscal Year for which any such Bonus was earned.

**Section 4. Duties.**

The Executive shall be employed as Executive Vice President – Business Development and shall have such duties as are assigned or delegated to him by the Chief Executive Officer or President of the Company. During the Employment Period, excluding any vacation to which Executive is entitled, and except as provided below, the Executive shall devote his entire business time, attention and energy exclusively to the business of the company and its Affiliates and shall cooperate fully with the senior management of the Company and the Board of Directors in the advancement of the best interests of the Company and its Affiliates. Executive shall report directly to Chief Executive Officer or President of the Company, but acknowledges that he will be required to work closely with other members of the Company's senior management.

**Section 5. Expenses.**

The Executive shall receive from the Company a $15,000.00 per year allowance during each calendar year of the Employment Period, or a pro-rata portion thereof, payable in equal bi-weekly installments which the Executive may use for business expenses, e.g., automobile lease payments, insurance, maintenance, gasoline, tolls, and other automobile related expenses. In addition to the expense allowance provided in the immediately preceding sentence and subject to compliance by the Executive with Company policies regarding expense reimbursement for the Company's officers generally, as may be adopted from time to time by the Company, the Executive is authorized to incur reasonable expenses in the performance of his duties hereunder in furtherance of the business and affairs of the Company and its Affiliates, and the Company will reimburse the Executive for all such reasonable expenses upon the presentation by the Executive of an itemized account satisfactory to the Company in substantiation of such expenses.

**Section 6. Vacations.**

The Executive shall be entitled to 216 Paid Time Off ("PTO") hours per year during the Employment Period, or a pro rata portion thereof; provided, however, that Executive shall not take PTO leave for more than two consecutive weeks.

**Section 7. Executive Benefits.**

During the Employment Period, Executive shall be eligible to participate in such profit-sharing, incentive stock option, 401(k), life insurance, disability, medical and other similar employee benefit plans of the Company that may be provided to executives of t

Company by the Board of Directors from time to time. To the extent that the Executive is eligible to participate in any such plans under the terms thereof, the Executive's participation shall be on the same terms as are provided by the Board of Directors to comparable executives of the Company (including, without limitation, the payment for such benefits). The terms of any benefit plan shall be at the discretion of the Board of Directors.

### Section 8. Termination.

(a) <u>Death</u>. The Employment Period, the Executive's Salary and any and all rights under this Agreement or otherwise as an Executive of the Company shall terminate (except as to Salary and rights accrued prior to such date of death) upon the death of the Executive.

(b) <u>Effect of Non-renewal</u>. Failure by the Company to agree to extend this Agreement for any period beyond July 31, 2008 shall result in the termination of the Executive's Salary and any and all rights under this Agreement as of July 31, 2008; but if the Executive is employed by the Company on July 31, 2008 and is immediately thereafter terminated, then the Executive shall receive the separation pay set forth in Section 8(f) below.

(c) <u>Termination by the Executive</u>. The Executive shall have the right to terminate this Agreement and his employment with the Company hereunder, upon written notice given to the Company at least thirty (30) days prior to his desired termination date (the "<u>Resignation Date</u>"). Any and all rights of the Executive under this Agreement shall terminate on the Resignation Date (except as to Salary and rights accrued prior to such date of termination).

(d) <u>Termination for Disability</u>. In the event that the Executive is substantially unable to perform his duties and responsibilities hereunder by reason of being Physically or Mentally Disabled (as defined below), the Company may terminate the Executive's employment, and its sole obligation hereunder shall be to pay to the Executive all of Executive's unreimbursed expenses and to continue the Executive's then current Salary and continue his benefits hereunder until the earliest of (i) the expiration of the Executive's then current Employment Period; (ii) the first payment to the Executive of benefits pursuant to a Long Term Disability Policy; or (iii) the expiration of twelve (12) months following the date the Executive is deemed to be disabled as provided herein. For purposes of this Agreement, the Executive shall be deemed to be "<u>Physically or Mentally Disabled</u>" if (i) for medical reasons he has been unable to perform his duties for thirty (30) consecutive days or ninety (90) days in any twelve (12) month period, all as determined in good faith by the Board of Directors, and (ii) the Company notifies the Executive or his spouse or representative of the termination of the Employment Period as a result of such disability.

(e) <u>Consequences of Termination for Cause</u>. In the event of termination for Cause, the Employment Period, the Executive's Salary and any and all rights under this Agreement or otherwise as an Executive, director or officer of the Company and its Affiliates shall terminate immediately (except as to Salary and rights accrued prior to such date of termination). For purposes of this Agreement, the term "<u>Cause</u>" shall mean termination by the Company of Executive's employment by reason of (i) the Willful failure by Executive to perform Executive's duties with the Company (other than any such failure resulting from Executive's being Physically or Mentally Disabled) after a written demand for substantial performance is delivered to Executive specifying the manner in which it is believed the Executive has not performed Executive's duties and giving Executive the opportunity to cure such non-performance within a fifteen (15) day period; (ii) the conviction of Executive of a crime constituting a felony or comparable criminal offense; (iii) the appropriation (or attempted appropriation) of a material business opportunity of the Company, including attempting to secure or securing any personal profit in connection with any transaction entered into on behalf of the Company; (iv) the misappropriation (or attempted misappropriation) of any of the Company's funds or property; (v) the material breach by the Executive of this Agreement and in the event that such breach is capable of being cured, the failure of the Executive to cure such breach within thirty (30) days of written notice of such breach, or (vi) any breach of the Executive's obligations set forth in Sections 9, 10 and 11 of this Agreement. For purposes of this Agreement, no act, or failure to act, on Executive's part shall be considered "<u>Willful</u>" unless done, or omitted to be done, by Executive in bad faith or without reasonable belief that Executive's action or omission was in, or not opposed to, the best interests of the Company.

(f) <u>Consequences of Termination Without Cause</u>. Subject to the applicability of Section 8(g) below and provided that the Executive has been employed by the Company and Supplies for an aggregate of at least twelve (12) months, in the event of termination without Cause, the Company shall pay the Executive as separation pay, all Salary, allowances as set forth in Section 5, and health benefits that would otherwise be due and payable hereunder for the period commencing on the date of such termination and ending twelve (12) months thereafter, payable in accordance with the Company's customary

payroll practices providing that the Executive executes a release of all claims against the Company, including, but not limited to, statutory (including all potential discrimination claims), contractual and tort claims upon termination of his employment.

(g) <u>Relevant Change of Control</u>. If a Relevant Change of Control occurs and provided that the Executive has been employed by the Company and Supplies for an aggregate of at least twelve (12) months, then the Executive shall receive as separation pay, all Salary, allowances as set forth in Section 5, and health benefits that would otherwise be due and payable hereunder for the period commencing on the date of such termination and ending twelve (12) months from the date of such relevant change of control, payable in accordance with the Company's customary payroll practices providing that the Executive executes a release of all claims against the Company, including, but not limited to, statutory (including all potential discrimination claims), contractual and tort claims upon termination of his employment. If, however, the Executive is offered employment with the new entity in a position of equal stature and responsibility with equal or greater compensation as Executive enjoyed prior to such Relevant Change in Control (or similar transaction), with employment on terms equal to or better than those set forth in this Agreement and is not required by the new entity to relocate office locations by more than 50 miles, the Company shall have no obligation to pay the separation pay referenced in this paragraph.

### Section 9. Non-Disclosure Covenant.

The Executive acknowledges that the Company is in the highly competitive business of the sale of office products and supplies. The Executive acknowledges the importance to the Company of protecting its confidential information and business relationships. The Executive understands that the Company depends upon this confidential information to obtain and continue its competitive advantage and that the Company's continued economic well-being is dependent upon protection of its confidential information and business relationships.

Therefore, the Executive covenants and agrees that he will not, during his employment with the Company, except in the performance of his duties hereunder, or at any time after the termination of his employment with the Company, communicate or disclose to any Person (other than the Company or its Affiliates and the Company's agents, consultants, auditors or attorneys), or use for his own account, without the prior written consent of the Company, any business information, observations, data, written material, records or documents relating to the business and affairs of the Company or any of its Affiliates, including, without limitation, any trade secrets, customer lists, information relating to sources of customers, financial, personnel and customer information, pricing and financing techniques, pricing or financial information concerning customers or vendors, and any confidential information concerning the business or affairs of the Company or any its Affiliates which was obtained or acquired by the Executive during the term of his employment with the Company and is not generally known in the industry. The Executive further covenants and agrees that he shall retain all such knowledge and information concerning the foregoing in trust for the sole benefit of the Company and its Affiliates and their successors and assigns.

### Section 10. Covenant Not To Compete; Non-Interference; Remuneration; Non-Disparagement.

(a) The Executive covenants and agrees that at any time during his employment by the Company or its Affiliates and for a period of twelve (12) months thereafter, in the event of a termination pursuant to Section 8 (f) hereof or in the event of a termination under any other circumstances, he will not, directly or indirectly, engage, invest in, own, manage, operate, control or participate in the ownership, management, operation or control of, be employed by, associated or in any manner connected with, or render services or advice to a Competitor. For the purposes of this Agreement, "Competitor" shall mean any business whose products or activities compete, directly or indirectly, in whole or in part, with the products or activities of the Company or its Affiliates, within 150 miles of any physical location of the Company, such as an office or warehouse; <u>provided</u>, that the Executive may invest in not more than 4.9% of the securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such securities are listed on any national or regional securities exchange or have been registered under Section 12 (g) of the Securities Exchange Act of 1934. A customer, manufacturer or wholesaler of office products or a group that represents manufacturers or wholesalers of office products shall not be deemed as a competitor for the purpose of this agreement.

(b) The Executive covenants and agrees that he will not, either directly or indirectly, whether for his own account or the account of any other Person, at any time during his employment by the Company or its Affiliates and for a period of twelve (12) months thereafter in the event of termination pursuant to Section 8 (f) hereof or in the event of termination under any other circumstances, solicit the business of any Person known to the Executive to be a customer or supplier,

#710713 v1

former customer or supplier, of the Company or its Affiliates as of the termination of Executive's employment with the Company or its Affiliates, whether or not the Executive had personal contact during, and by reason of, his employment with the Company.

(c) The Executive covenants and agrees that he will not, either directly or indirectly, whether for his own account or the account of any other Person, at any time during his employment by the Company or its Affiliates and for a period of twelve (12) months thereafter in the event of termination pursuant to Section 8 (f) hereof or in the event of termination under any other circumstances, solicit, employ or otherwise, engage, as an employee, independent consultant or otherwise, any Person who is or was an employee or consultant of the Company or its Affiliates at any time during Executive's employment with the Company or its Affiliates, or in any manner induce or attempt to induce any employee or consultant of the Company or its Affiliates to terminate his or her employment or consulting relationship with the Company or its Affiliates (as the case may be); and except as otherwise permitted herein, the Executive covenants and agrees that he will not, either directly or indirectly, whether for his own account or the account of any other Person, at any time during his employment by the Company or its Affiliates at any time during or after the termination of the Executive's employment by the Company or its Affiliates, interfere with the relationship of the Company or its Affiliates with any Person, including any Person who at any time during the Executive's employment with the Company or its Affiliates was an employee or consultant of the Company.

(d) The Executive covenants and agrees that during his employment by the Company he will not directly or indirectly receive any remuneration from the Company or anyone connected with the Company except as provided pursuant to the terms of this Agreement, unless agreed in writing by the Company.

(e) The Executive and the Company further covenant and agree that at no time during or after Executive's employment by the Company will either party disparage the other party or any of the Company's Affiliates, shareholders, directors, officers, employees, or agents. The Executive also agrees not to take any action, directly or indirectly, to disrupt the Company's relationship with its vendors or suppliers.

(f) The Executive further covenants and agrees that if any provision of this Section 10 is held by a court of competent jurisdiction to be unreasonable, arbitrary, or against public policy, such provision will be considered to be divisible with respect to scope, time, and geographic area, and such lesser scope, time, or geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary, and not against public policy, will be effective, binding, and enforceable against the Executive.

(g) The Executive agrees and acknowledges that his offer of employment with the Company, continued employment and the compensation and benefits set forth herein are adequate and sufficient consideration for his agreement to the obligations set forth in Sections 9, 10 and 11. It is understood by and between the parties hereto that the foregoing covenants by the Executive set forth in this Section 10 are essential elements of this Agreement and that, but for the Agreement of the Executive to comply with such Covenants, the Company would not have entered into this Agreement. The Company and the Executive each have had an opportunity to consult with independent legal counsel concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the businesses conducted by the Company and its Affiliates.

Section 11. **Covenant To Report; Ownership Of Trade Secrets, Etc.**

(a) The Executive shall promptly communicate and disclose to the Company all observations made and data obtained by him in the course of his employment with the Company. All written materials, records and documents (either electronic or hard copy) made by the Executive or coming into his possession during the Employment Period concerning the business or affairs of the Company or any of its Affiliates shall be the sole property of the Company and its Affiliates; and upon the termination of the Employment Period or upon the earlier request of the Company during the Employment Period, the Executive shall promptly deliver the same to the Company (or its designee). The Executive agrees to render to the Company or to any of its Affiliates such reports of the activities undertaken by the Executive or conducted under the Executive's direction during the Employment Period, as the Company or any such Affiliate may request.

(b) The Executive agrees that any trade secret, invention, improvement, patent, patent application or writing, and any program, system or novel technique (whether or not capable of being trademarked, copyrighted or patented) conceived, devised, developed or otherwise obtained by him during the Employment Period relating to the business, property,

#710713 v1

methods, suppliers or customers of the Company or any of its Affiliates shall be and become the property of the Company and its Affiliates; and the Executive agrees to give the Company prompt written notice of his conception, invention, authorship, development or acquisition of any such trade secret, invention improvement, patent, patent application, writing, program, system or novel technique and to execute such instruments of transfer, assignment, conveyance or confirmation and such other documents and to do all appropriate lawful acts as may be required by the Company to transfer, assign, confirm and perfect in the Company all legally protectible rights in any such trade secret, invention, improvement, patent, patent application, writing, program, system or novel technique.

### Section 12. Remedies.

The Executive acknowledges that the Company will have no adequate remedy at law if the Executive violates any of the terms of this Agreement. In such event, the Company shall have the right, in addition to any other rights it may have, to obtain, in any court of competent jurisdiction, injunctive relief to restrain any breach or threatened breach hereof or otherwise to specifically enforce any of the provisions of this Agreement. In addition, the Executive agrees and hereby irrevocably waives any right he may have to require the Company to post a bond or other security of any kind in connection with such actions.

### Section 13. Definitions.

Unless otherwise defined herein, the following terms shall have the meanings ascribed to them below:

(a) "Affiliate" shall mean any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with another Person.

(b) "Board of Directors" shall mean the board of directors of the Company.

(c) "EBITDA" shall mean, with respect to the Company, for each Fiscal Year, earnings before interest, taxes, depreciation and amortization, consistently determined with the internal financial statement of the Company and the Projected EBITDA, as adjusted from time to time for acquisitions by the Company or its Affiliates.

(d) "Fiscal Year" shall mean the Company's fiscal year as it exists on the Effective Date or as changed from time to time.

(e) "Person" shall mean any individual, corporation, firm, association, partnership, other legal entity or other form of business organization.

(f) "Projected EBITDA" shall mean, for each Fiscal Year, the amount of EBITDA determined in good faith by the Board of Directors as of the end of the eleventh month of the preceding Fiscal Year, as adjusted from time to time for acquisitions by the Company or its Affiliates.

(g) "Relevant Change of Control" means (i) a sale by the Company of all or substantially all of its assets; or (ii) a single transaction resulting in the acquisition of the voting securities of the Company representing more than fifty percent (50%) of the combined voting power of the Company's securities having the right to vote at the election of Directors; (iii) in the case of a Relevant Change of Control described in clauses (i) or (ii) above (or any other case where the Company ceases to continue its operation as a consequence of a similar transaction), the failure of the acquiring Person (or any of its Affiliates) to offer employment to the Executive in a position of equal stature and responsibility with equal or greater compensation as Executive enjoyed prior to such Relevant Change in Control (or similar transaction).

### Section 14. Compliance With Other Agreements.

The Executive represents and warrants that the execution and delivery by him of this Agreement and the performance by Executive of his obligations hereunder will not, with or without the giving of notice or the passage of time, (i) violate any judgment, writ, injunction or order of any court, arbitrator or governmental agency applicable to him, or (ii) conflict with, result in the breach of any provisions of or the termination of, or constitute default under, any agreement to which the Executive is a party or by which he is or may be bound. The Executive agrees to indemnify and hold the Company harmless from and against any and all claims for losses, liabilities, damages, costs and expenses which may arise or result from the violation of any such judgment, writ, injunction or order or the breach of any such agreement referred to in the immediately preceding sentence.

#710713 v1

Section 15.    **Waiver Of Breach.**

The waiver by any party hereto of a breach of any provision if this Agreement shall not operate nor be construed as a waiver of any subsequent breach.

Section 16.    **Binding Effect; Benefits.**

This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto and their respective successors, assigns, heirs and legal representatives, including any entity with which the Company may merge or consolidate or to which it may transfer all or substantially all of its assets. This Agreement evidences the joint effort of the Executive and the Company and shall not be more harshly or constrictively interpreted against any Person.

If any successor or assign of the Company fails to make the separation payments required under Section 8(g) upon Termination without Cause as required by that section, then in addition to any other available remedies, Executive shall be released from the requirements under Section 10 of this Agreement.

Section 17.    **Notices.**

All notices and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) one (1) business day after being mailed with a nationally recognized overnight courier service, or (c) three (3) business days after being mailed by registered or certified first class mail, postage prepaid, return receipt requested, to the parties hereto at the address set forth above (as the same may be charged from time to time by notice similarly given) or the last known business or residence address of such parties.

Section 18.    **Entire Agreement; Amendments.**

This Agreement contains the entire agreement and supercedes all prior agreements and understandings, oral or written, between the parties hereto with respect to the subject matter hereof, including the Existing Employment Agreement. This Agreement may not be changed orally, but only by an agreement in writing signed by the party against whom any waiver, change, amendment, modification or discharge is sought.

Section 19.    **Severability.**

The invalidity of all or any provision of this Agreement shall not render invalid the remainder of this Agreement or the remainder of such provision. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable.

Section 20.    **Governing Law; Consent to Jurisdiction.**

This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey without giving effect to the principles of conflicts of law thereof. The parties hereto each hereby submits himself or itself for the sole purpose of this Agreement and any controversy arising hereunder to the non-exclusive jurisdiction of the courts in the State of New Jersey, and waives any objection (on the grounds of lack of jurisdiction or *forum non conveniens*, or otherwise) to the exercise of such jurisdiction over it or him by any court in the State of New Jersey.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date first above written.

AOS ACQUISITION CORP.

By: _____
Name: MICHAEL PALMER
Title: EXECUTIVE VICE PRESIDENT &
       CHIEF OPERATING OFFICER

Agreed and Accepted as of the date first written above:

By: _____
ROGER POST

#710713 v1

EXHIBIT A

BONUS SCHEDULE

| EBITDA | % OF BASE SALARY |
|---|---|
| < 95% | Discretionary – Approval by Board of Directors |
| 95% | 35% |
| 105% | 45% |
| 115% | 55% |
| 125% | 65% |
| >125% | 65% plus such additional percentage, if any, as determined in the discretion of the Board of Directors |

NOTE: To the extent that the Company misses, or the bonuses to be paid to the Executive and other members of the Company's senior management would cause the Company to miss, the EBITDA target set by the Company's secured lender for the applicable time period, then the bonuses to the Executive and other members of the Company's senior management shall be reduced proportionally to amounts that permit the Company to be in compliance with the EBITDA target